IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANTOINETTE STEWART, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 17-2148 |
| | § | |
| CAROLYN COLVIN, COMMISSIONER | § | |
| OF THE SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Before the court in this social security appeal is Plaintiff's Motion for Summary

Judgment (Document No. 19) and Defendant's cross Motion for Summary Judgment (Document

No. 21). Having considered the cross motions for summary judgment, the parties' additional

briefing, the administrative record, the written decision of the Administrative Law Judge, and the

applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for

Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and

the decision of the Commissioner is AFFIRMED.

**I.     Introduction**

Plaintiff Antoinette Stewart ("Stewart") brings this action pursuant to § 405(g) of the

Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

her application for disability insurance benefits ("DIB"). Stewart maintains in this appeal that:

(1) "The ALJ improperly determined Plaintiff's residual functional capacity;" (2) "The ALJ

improperly determined Ms. Stewart's mental impairments;" and (3) "The ALJ erred in finding

1

that a significant number of jobs existed in national economy that Plaintiff could perform." Plaintiff's Brief in Support of Motion for Summary Judgment (Document No. 20) at 1. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, and that the decision comports with applicable law.

## II.     Administrative Proceedings

On September 2, 2014, Stewart applied for DIB, claiming she has been unable to work since March 22, 2014 as a result of injuries to her ankles and lower back, arthritic hands, high blood pressure, anxiety attacks and acid reflux (Tr. 120, 82, 92, 197-208, 234). The Social Security Administration denied the application at the initial and reconsideration stages. Stewart requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Kevin Batik, held a hearing on July 27, 2016. (Tr. 34-81, 90, 100, 102-103, 115, 127-129, 150-152). On January 19, 2017, the ALJ issued his decision finding Stewart not disabled. (Tr. 1-7, 20-29). On April 14, 2017, the Appeals Council denied Stewart's request for review. (Doc No. 18-3 at 2).

## III.    Standard of Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692 (5th Cir. 1999). Indeed, Title 42, § 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not

supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or no 'contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving the disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically

accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment

must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work, but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy exists for him, or whether he would be
> hired if he applied to work.

42. U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that

one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of

engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir.

1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of
   impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in
   Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not
   disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial
   gainful activity, taking into consideration his age, education, past work experience
   and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren*

*v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this framework, the claimant bears the

burden of proof on the first four steps of the analysis to establish that a disability exists.  If

successful, the burden shifts to the Commissioner, at step five, to show that the claimant can

perform other work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Once the

Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Id.; Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step one that Stewart had not engaged in substantial gainful activity since March 22, 2014, her alleged onset date. At step two, the ALJ found that Stewart's "degenerative disc disease of the cervical spine, osteoarthritis of the right knee, hypertension, obesity, major depressive disorder, and anxiety" were severe impairments. (Tr. 85, 345, 380-83, 392, 464). At step three, the ALJ concluded that Stewart did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including Listings 1.02, 1.04, 4.00, 12.04, and 12.06. The ALJ then, prior to consideration of steps four and five, determined that Stewart has the residual functional capacity ("RFC") to perform medium work[1] subject to the following limitations: "occasional climbing of ramps/stairs, balancing, stooping, kneeling, and crouching. She cannot crawl or climb ladders, ropes, and scaffolds. She is limited to understanding and remembering detailed but not complex instructions, and she is limited to occasional interaction with the public, coworkers, and supervisors." (Tr. 26). At step four, using that RFC and relying on the testimony of a vocational expert that Stewart's past work was low in exertion and skilled or semiskilled, the ALJ determined that Stewart could not perform her past work as a Fast Food Restaurant Manager or a CVS Pharmacy Technician. (Tr. 28). At step five, using that same RFC and considering

---

[1] Medium work includes the ability to lift no more than 50 pounds at a time with frequent lifting, carrying of objects weighing up to 25 pounds, the ability to sit 6 hours out of an 8-hour workday, and stand and walk 6 hours out of an 8-hour workday. *See* 20 C.F.R. §§ 404.1567(c); 416.967(c); SSR 832-10, 1983 WL 31251 (describing the exertional requirements of medium work).

Stewart's age, education, and work experience, and the Medical-Vocational Guidelines ("MVG"), the ALJ concluded that there were jobs in significant numbers in the national economy that Stewart could perform, and that she was, therefore, not disabled. (Tr. 28).

In this appeal, Stewart first argues that the ALJ improperly determined Stewart's residual functional capacity. Stewart also argues that the ALJ improperly determined Stewart's mental impairments. Finally, Stewart argues that the ALJ erred in finding that a significant number of jobs existed in national economy that Stewart could perform.

In determining whether there is substantial evidence to support the ALJ's decision, including his assessment at step three, the court considers four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren*, 925 F.2d at 126.

## V.    Discussion

### A.    Objective Medical Evidence

The objective medical evidence in the record shows that Stewart suffers from degenerative disc disease of the cervical spine, osteoarthritis of the right knee, hypertension, obesity, major depressive disorder, and anxiety. (Tr. 85, 345, 380-83, 392, 464).

On November 11, 2013, Dr. Ekpo at Concentra Medical Centers saw Stewart for complaints of back, ankle, and shoulder pain caused by a fall at her job the day before. (Tr. 306). During the visit, Stewart presented as well nourished with no acute distress. (Tr. 307). Dr. Ekpo noted that Stewart's back and thoracic range of motion was slightly limited and that her shoulder range of motion decreased in abduction. (Tr. 307). Stewart's right shoulder also had increased

tissue texture with pain with palpation. (Tr. 307). Stewart's right ankle was swollen with limited range of motion and an antalgic gait. (Tr. 307). Dr. Ekpo diagnosed Stewart with a right ankle sprain, right shoulder strain, thoracic strain, back contusion, and back pain. (Tr. 307). The treatment consisted of crutches, an ankle brace, medications, physical therapy, and work modifications so that Stewart did not lift over 15 pounds on her right side and did not walk or stand longer than 15 minutes per hour on her right leg. (Tr. 307).

On November 14, 2013, Stewart returned to Concentra for a progress check on her injuries. (Tr. 309). Stewart had stopped working at this time because of continued pain in her ankle, back, and shoulder. (Tr. 309). Dr. Ekpo noted that Stewart's shoulder and thoracic muscles had normal ranges of motion, and that Stewart's right ankle had lingering pain with an antalgic gait. (Tr. 309). Stewart's x-ray and lab reports returned negative for fracture. (Tr. 310). Dr. Ekpo returned the same assessment as the one from Stewart's previous visit and dispensed an orthopedic boot along with continued medications of Norco, Flexeril, and Mobic. (Tr. 310). Stewart's work restrictions remained in place. (Tr. 310).

On November 18, 2013, Stewart went in for an initial evaluation with physical therapist Bozena Phillips at Concentra Medical Center. (Tr. 311). Phillips conducted a shoulder capsular mobility test that indicated that the superior scratch and the interior scratch were hypomobile and painful. (Tr. 313). Stewart reported pain with all movements above shoulder level and the examination was consistent with the medical diagnosis of Stewart's right shoulder injury. (Tr. 314). Phillips prescribed physical therapy and therapeutic exercises to resolve all functional deficits from Stewart's injury. Stewart's shoulder mobility was assessed at 80 to 99 percent impaired, and Phillips set a mobility goal of 40 to 60 percent. (Tr. 316). Phillips also cautioned

that Stewart might have sustained fractures to the right distal lateral and medial malleoli. (Tr. 317).

The same day, Stewart saw Dr. Ekpo at Concentra Medical Center for a progress check on her injury. (Tr. 318). Dr. Ekpo noted Stewart's shoulder showed no deformity and had an active range of motion from all directions without pain. (Tr. 318). Stewart's thoracic tenderness had also abated and regained full range of motion, though her ankle was still tender and had decreased range of motion. (Tr. 318). Stewart was prescribed Flexeril, Ultram, and Norco for pain. (Tr. 319). She was also prohibited from lifting over 15 pounds on her right side, standing or walking longer than 15 minutes per hour, and reaching above her shoulder on the right. (Tr. 319).

Stewart returned to Concentra to see Phillips for her second physical therapy appointment on November 21, 2013. (Tr. 320). Stewart tolerated treatment without adverse reactions and was compliant with instructions. (Tr. 320). Stewart's goal status for treatment progressed as anticipated per protocol. (Tr. 321). In this report, Phillips confirmed that Stewart did not have fractures to her right distal lateral and medial malleoli. (Tr. 322). Stewart's third physical therapy visit with Phillips at Concentra took place on November 25, 2013, and Stewart reported feeling better with lower pain levels. (Tr. 324). Phillips remarked that Stewart was progressing as expected and had good potential to improve functional status to return to normal work duty without limitations. (Tr. 326). Following Stewart's physical therapy appointment, Stewart went in for another progress checkup with Dr. Ekpo's substitute at Concentra. (Tr. 330). Stewart was still not working, but had made noted improvement. (Tr. 330). Stewart's prescriptions and work modifications remained the same. (Tr. 331). On November 27, 2013, Stewart went in for her

fourth physical therapy appointment with Phillips at Concentra. (Tr. 332). Stewart was noted to have made steady progress as expected and experienced a decrease in pain levels. (Tr. 333).

Stewart saw Dr. Ekpo for her last appointment at Concentra on December 9, 2013. (Tr. 335). Stewart's right shoulder had full range of motion and her right ankle had mild swelling at the lateral malleolus with no tenderness. (Tr. 335). Stewart was prescribed pain medication and was advanced to regular duty for work-related activities. (Tr. 335). Stewart was also released from occupational medicine at this time. (Tr. 336).

On April 25, 2014, Stewart went to see Dr. Kimulique Allen to establish care as a new patient. (Tr. 342). Dr. Allen assessed Stewart with low energy and weight gain, since Stewart gained approximately 50 pounds over the last year. (Tr. 344). Stewart had no trouble sleeping and no anxiety or depression. (Tr. 344). Stewart presented negative for headaches, dizziness, or shortness of breath and positive for leg pain with walking. (Tr. 344). Stewart also did not have any back pain, joint pain, or muscle pain. (Tr. 344). Stewart appeared alert and oriented with a pleasant demeanor. (Tr. 344). Dr. Allen assessed Stewart with non-severe hypertension and weight gain. (Tr. 345). Dr. Allen determined that Stewart's work injuries in 2013 presented no evidence that would support the ongoing symptoms. (Tr. 112).

On November 20, 2014, Stewart was examined by Nicole Bereolos, PhD to determine disability status for Stewart's anxiety. (Tr. 360). Stewart drove to the appointment and reported that she was capable of managing her own finances and driving, but needed assistance with bathing, grooming, cooking, and cleaning because of her poor balance and pain. (Tr. 362). Stewart reported battling depression since the age of 9, along with difficulty falling asleep, though Dr. Bereolos noted that Stewart's records did not indicate any history of anxiety or depression. (Tr. 362). Stewart displayed adequate hygiene, walked unassisted, and spoke

normally. (Tr. 363). Dr. Bereolos noted that Stewart's remote memory appeared to be good, but her working memory was impaired based on Stewart's inability to recall previously presented information after a 5-minute delay. (Tr. 363). Stewart could perform simple auditory attention tasks and her abstract reasoning appeared to be intact. (Tr. 363). Dr. Bereolos opined that Stewart's symptoms most closely fit the diagnoses of "[o]ther specified depressive disorder, with anxious distress, mild." (Tr. 363).

On December 23, 2014, Dr. Leigh McCary signed off on Stewart's Disability Determination Explanation at the initial level. (Tr. 82). Dr. McCary took into consideration the totality of Stewart's medical history and determined that Stewart's alleged limitations from her work injury in November 2013, hypertension, and obesity were partially supported by the evidence on record. (Tr. 85). On the same day, Dr. Lee Wallace evaluated Stewart's condition and history to determine impairments and severity. (Tr. 86). Dr. Wallace found Stewart to have non-severe hypertension under Listing 4.04 and severe affective disorders under Listing 12.04 with mild effect on daily activities and social functioning and moderate effect on maintaining concentration. (Tr. 86). Dr. Wallace considered Stewart's medical history from Dr. Bereolos' treatment and diagnosis of depressive disorder for Stewart. (Tr. 86-87). Dr. Wallace noted that Stewart drives and manages her own finances. (Tr. 87). Dr. Wallace found that the alleged limitations were partially supported by the evidence on record. (Tr. 87). Dr. Wallace assessed that one or more of Stewart's medically determinable impairments could be reasonably expected to produce Stewart's symptoms, but that Stewart's statements about the intensity and functional limitations of the symptoms were not substantiated by the objective medical evidence alone. (Tr. 87). Dr. Wallace proceeded to perform a mental RFC assessment for Stewart to help determine her ability to perform sustained work activities. (Tr. 88). Dr. Wallace found that Stewart's

understanding and memory limitations were not significantly limited and that Stewart's sustained concentration and persistence were all either not significantly limited or only moderately limited. (Tr. 88). Dr. Wallace explained that Stewart could understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting. (Tr. 89).

On January 5, 2015, Dr. Leah McCary assessed Stewart's ability to perform past relevant work as a manager and loss prevention. (Tr. 90). Dr. McCary determined Stewart had the RFC to perform Stewart's past relevant work and that Stewart was not disabled. (Tr. 90).

On March 17, 2015, Stewart went to see Dr. Arifa Nishat at Martin Luther King Jr. Family Clinic for pain in her limb. (Tr. 367). Stewart reported arthritis, pain in her left leg, and trouble eating. (Tr. 368). Stewart presented alert and normal, with one instance of tearfulness in the office. (Tr. 383-84). Stewart reported feeling disinterested in doing things and feeling depressed nearly every day. (Tr. 384). Dr. Nishat diagnosed Stewart with hypertension, arthritis, and depression. (Tr. 383).

On April 14, 2015, Stewart had a follow up appointment with Dr. Nishat where Stewart was diagnosed with hypertension, arthritis, and depression. (Tr. 380-81). Stewart appeared alert and normal, but reported feeling little interest in doing things nearly everyday and feeling down, depressed, or hopeless nearly everyday as well. (Tr. 381, 429). Dr. Nishat assessed Stewart's right knee joint pain, benign hypertension, esophageal reflux, major depressive disorder, insomnia, and pain in upper arm. (Tr. 382). Stewart was then referred to Dr. Kumud Joshi for a consult. (Tr. 377). Dr. Joshi diagnosed Stewart with hypertension, arthritis, and depression, noting that Stewart was uncooperative and guarded through the interview (Tr. 378-79). Dr. Joshi recommended medication, therapy or other supportive service. (Tr. 379).

On May 14, 2015, Dr. Leela Reddy completed Stewart's Disability Determination Explanation at the reconsideration level. (Tr. 104). Dr. Reddy noted that Stewart exaggerated her physical and mental symptoms and that Stewart's alleged limitations were partially supported by the evidence on record. (Tr. 108). Dr. Reddy also noted that Stewart's allegation that she experienced limitations on all available activities was not supported by the evidence on record. (Tr. 108). Stewart reported changes since her last physical or mental examination in that she falls often and cannot get along with anyone. (Tr. 105). Dr. Reddy assessed Stewart's Medically Determinable Impairments of severe osteoarthritis and severe affective disorders under Listing 12.04, finding that Stewart had moderate restrictions and difficulties in daily activities and social functioning. (Tr. 108-09).

Dr. Randall Reid also assessed Stewart in May 2015 to determine her physical RFC to help determine disability benefits. (Tr. 110). Dr. Reid determined that Stewart's physical RFC was such that she could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds. (Tr. 110). Dr. Reid also determined that Stewart could stand or walk for a total of 4 hours and sit for a total of about 6 hours in an 8-hour workday. (Tr. 111). Stewart was otherwise limited to only occasionally climbing ramps/stairs, ladders/scaffolds, balancing, stooping, kneeling, crouching, and crawling. (Tr. 111). Dr. Reddy then ssessed Stewart's mental RFC; determining that Stewart's understanding and memory were not significantly limited and that Stewart's concentration and persistence were either not significantly limited or moderately limited. (Tr. 112-13). Taking into consideration the entirety of Stewart's medical history and current evaluations, Dr. Reid proceeded to pronounce Stewart not disabled. (Tr. 115).

On June 12, 2015, Stewart returned to see Dr. Nishat for her two-month follow up appointment. (Tr. 431). Stewart's diagnoses remained the same, but she reported feeling interested in doing things and not feeling depressed or hopeless at all. (Tr. 433). Stewart's laboratory tests returned results within the expected range. (Tr. 658-661). On September 16, 2015, Stewart had another follow up with Dr. Nishat and stated that she had all her medications but did not receive Trazodone, which was remedied on this visit. (Tr. 435). Stewart appeared normal and alert, and her diagnoses remained consistent. (Tr. 437).

On September 30, 2015, Stewart visited Parkland Health & Hospital System for difficulty swallowing. (Tr. 505). Stewart was treated and discharged in good condition. (Tr. 507).

On October 26, 2015, Stewart had another one-month follow up appointment with Dr. Nishat. (Tr. 439). Stewart reported pain all over and requested relief for her arthritis and anxiety. (Tr. 439). Dr. Nishat assessed Stewart's hypertension and anxiety. (Tr. 441). Stewart reported feeling interested in doing things and not feeling depressed at all. (Tr. 441). On January 4, 2016, Stewart saw Dr. Nishat for a medication refill and reported back and right knee pain. (Tr. 443). Stewart presented normal and alert. (Tr. 445). Dr. Nishat assessed Stewart's anxiety, polyneuropathy, depression, esophageal reflux, and hypertension. (Tr. 445). Her knee showed abnormalities and pain with movement, but appeared normal and was not tender to palpation. (Tr. 445). Dr. Nishat prescribed the use of a cane, which Stewart had previously received. (Tr. 446).

On March 28, 2016, Stewart returned for a two month follow up with Dr. Nishat and reported migraines and pain in the neck, shoulder, hands, and lower back. (Tr. 448). Dr. Nishat diagnosed Stewart with hypertension, arthritis, backache, migraine headache, and depression. (Tr. 463). Physical findings of Stewart's cervical spine showed abnormalities, but showed a

normal appearance with no tenderness or muscle spasms. (Tr. 464). Cervical spine motion was normal. (Tr. 464). Stewart's knee showed abnormalities and elicited pain when in motion, but appeared normal with no tenderness. (Tr. 464).

On April 14, 2016, Stewart was seen by Dr. Javier Caldera-Nieves at Baylor University Medical Center for emergency treatment for Stewart's chronic back and knee pain. (Tr. 387). Dr. Caldera-Nieves performed x-rays and diagnosed Stewart with chronic pain, mild right knee osteoarthritis, and cervical spondylosis, a moderate degenerative disk disease. (Tr. 392).

On April 26, 2016, Stewart seen by Susan Payberah at MLK Jr. Family Clinic for tests on her functional status. (Tr. 452). Stewart's results were all within the expected range. (Tr. 452-55). Stewart's cervical spine and knee showed abnormalities and tenderness. (Tr. 469). Stewart reported interest in doing things and did not feel depressed at all. (Tr. 469-70). On June 21, 2016, Stewart returned for a follow up with Payberah for medication refills and migraines. (Tr. 471). Payberah noted recent weight gain and tenderness in Stewart's back, spine, and knee. (Tr. 473). Stewart's mental state remained consistent from her last checkup. (Tr. 474). Stewart returned to see Payberah on June 24, 2016 for a medication refill.

On January 10, 2017, Stewart was referred by Dr. Anthony Gioia to see Dr. Nicholas G. Iwasko at Prime Diagnostic Imaging for Stewart's knee pain and to evaluate for internal derangement. (Tr. 512). Dr. Iwasko found that Stewart had a small knee effusion, fibulopopliteal bursitis, a tear of the lateral meniscal body with inferior articular surface extension, and a tear of the medial meniscus with inferior articular surface extension near the junction between the body and posterior horn segments. (Tr. 512).

On March 7, 2017, Stewart saw Dr. Sedhain for a psychiatric diagnostic evaluation of her depression and anxiety. (Tr. 8). During this examination, Stewart was noted to be adequately

groomed and cooperative with medical professionals. (Tr. 8). However, Stewart reported

struggling with depression and anxiety from a young age and having been on a variety of drugs

such as Prozac, Cymbalta, and Trazodone. (Tr. 8). Her anxieties were noted to manifest in

symptoms interfering with life. (Tr. 9). Stewart's psychiatric history also contained struggles

with inability to sleep, decreased enjoyment, poor concentration, and crying spells brought on by

excessive worry. (Tr.9). Dr. Sedhain assessed Stewart to have major depressive disorder and

general anxiety disorder. (Tr. 9).

Stewart's first claim, that the ALJ improperly determined her physical residual functional

capacity, is without merit. The determination of RFC is an administrative assessment – based on

the totality of the evidence – of the extent to which a claimant's impairments and related

symptoms affect her capacity to perform work-related activities. *See* 20 C.F.R. § 404.1545. The

objective medical evidence in the record supports the ALJ's conclusion at step three that Stewart

did not have an impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments in 20 C.F.R. Part 404.

First, Stewart alleges serious limitations from her fall at work, which resulted in back,

shoulder, and ankle injuries sustained in 2013. For any disability determination to be made, even

under the Listings, the disabling condition must be found to last, or be expected to last, "for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Section 1.00H1, which

notes the importance of a longitudinal record for back impairments, takes this into account:

> 1. *General.* Musculoskeletal impairments frequently improve with time or respond
> to treatment. Therefore, a longitudinal clinical record is generally important for
> the assessment of severity or expected duration of an impairment unless…the
> claim can be decided favorably on the basis of current evidence.

Here, Stewart's argument that her workplace injury severely impacted her activities in

daily life has no bearing on this disabilities determination because the objective medical record

showed a full recovery. Stewart goes on to claim that the ALJ erred in determining that there are

no clinically documented abnormalities regarding Stewart's right leg because Stewart's doctors

found fractures of her right distal lateral and medial malleoli and rated her mobility at 80-99%

impaired. However, Stewart is citing her injury from falling at work in November 2013, and the

limitations discussed by Stewart were noted within a few days following the injury, but there is

no indication that she continued to be so impaired. (Tr. 307). In fact, her treatment notes

suggested that Stewart was an appropriate physical therapy candidate to resolve all the functional

deficits noted above. (Tr. 315). Accordingly, Dr. Ekpo treated Stewart from November 2013 to

December 2013 and advanced Stewart to regular duty at work after completing treatment

through medication and physical therapy. Stewart's additional argument that her January 2017

diagnosis of a torn medial and lateral meniscus (Tr. 512) should be considered for her disability

determination also fails because a torn meniscus is not a per se disabling condition that is

expected to last "for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Next, Stewart argues that the ALJ neglected to consider the impact of Stewart's obesity

in determining her RFC and that it would render the ALJ's findings unsupported. The combined

effects of obesity with other impairments may be greater than might be expected without obesity.

For example, someone with obesity and arthritis affecting a weight-bearing joint may have more

pain and limitation than might be expected from arthritis alone. However, the ALJ's decision

clearly sets out the impact of Stewart's obesity on determining her RFC. (Tr. 23).

> "SSR 02-1p directs the fact finder to consider obesity when, alone or in combination with
> other impairments, it has more than a minimal limiting effect on the claimant's ability to
> perform basic work activity. The claimant's…body mass index of 32…is classified as
> obese by the National Institutes of Health (Clinical Guidelines on the Identification,
> Evaluation, and Treatment of Overweight and Obesity in Adults, NIH Publication No.
> 98-4083). Although there is no explicit mention of obesity as disabling in the record, it is
> reasonable that the claimant's obesity might exacerbate her pain. Accordingly, the RFC

limits her to medium work with postural limitations that account for any additional exacerbation caused by obesity.

(Tr. 23). Accordingly, the ALJ's decision is supported because he took into consideration Stewart's exacerbating factor of obesity when determining her RFC.

Stewart then points out that her additional conditions of neuropathy and migraines during the relevant period were improperly or not considered by the ALJ when determining her RFC. The ALJ must consider factors such as the claimant's work-related activities and those of daily living, the duration, frequency, and intensity of the claimant's symptoms, precipitating and aggravating factors of the symptoms, the effects of medication, and any other relevant factors. *Cooper v. Berryhill*, 244 F.Supp.3d 824, 830-31 (S.D. Indiana 2017) (citing 20 C.F.R. § 404.1529(c)). In this case, the ALJ considered these conditions (Tr. 23-24), and their mere presence does not confer disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). Stewart must show that she was so functionally impaired that she could not perform any substantial gainful activity. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). In this case, Stewart provided no credible evidence that her impairments produced disabling functional limitations and Stewart's contention that the side effects of her medications leave her drowsy, uncoordinated, weak, nauseated, unfocused, and fatigued also lack objective evidence in the record. (Tr. 366-73). On the contrary, the medical records Stewart cited only list the various medications she was taking, and Stewart also denied having side effects from her antidepressants at her medical appointments in 2015 and 2016 (Tr. 377, 467). Even so, the ALJ accounted for Stewart's limitations by placing limitations on the level of medium work she could perform, limiting her capabilities to understanding and remembering detailed but not complex instructions, and only occasional interaction with the public, coworkers, and supervisors. (Tr.

17

26). Accordingly, the ALJ properly determined Stewart's RFC by reference to substantial evidence in the record and by applying the correct legal standards.

Stewart's second claim, that the ALJ improperly evaluated her mental impairment by finding that she had only mild and moderate limitations in the mental function areas, is also without merit. The ALJ has the duty to resolve conflicts in the medical evidence, *see Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002), but is not required to explicitly discuss all the evidence that supported the decision or was rejected. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). With regard to Stewart's mental impairments, the ALJ found that she consistently presented to her physicians as "pleasant" and "cooperative." (Tr. 27, 405, 407). In Stewart's April 2014 medical appointment, she presented as alert and oriented without noted behavioral or cognitive abnormalities. (Tr. 23, 344). Similarly, Stewart's November 2014 consultative exam with Dr. Bereolos noted that Stewart was alert and oriented with good remote memory; her working memory was impaired at five minutes; but she had no difficulties with simple auditory tasks. (Tr. 23, 363). During Stewart's April 2015 appointment with psychiatrist Dr. Joshi, Stewart presented as alert and oriented, with an instance of tearfulness in the office. (Tr. 23, 379). Likewise, in April 2016, Stewart reported to Baylor University Medical Center for x-rays and her triage assessment noted her to be alert and cooperative with appropriate behavior. (Tr. 23, 405). Aside from Stewart's limitations with her working memory, the record showed no cognitive abnormalities and no indication of further difficulties. (Tr. 27).

Additionally, the ALJ also considered the opinions of State agency medical consultants Dr. Wallace and Dr. Reddy, who opined that Stewart could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (Tr.

27, 88-89, 98-99, 112-113, 124-145). These opinions were found to be consistent with the record and the objective observations in Stewart's consultative examination, which showed some limitations with memory but no other abnormalities. (Tr. 27, 362-64). Stewart also claimed that the majority of the relevant record evidence is inconsistent with the ALJ's mild and moderate findings and cites to Dr. Bereolo's assessment that Stewart "meets criteria for disability consistent with other specified depressive disorder with, mild." (Tr. 363). The evidence in the record that Stewart cited directly supports the ALJ's finding of the mild nature of Stewart's mental impairments. The ALJ gave partial weight to consultative examiner Dr. Bereolos's opinion that Stewart's comprehension did not seem to be impaired, but that her condition did seem to affect her ability to interact effectively. (Tr. 27, 364). The ALJ noted that this opinion was vague and failed to provide specific vocational limitations. The ALJ also noted that the social function limitations were not well explained or supported by the record, which showed that Stewart was consistently cooperative and pleasant (Tr. 27, 364). Thus, the ALJ gave Dr. Bereolos' opinion partial weight. (Tr. 27).

Following the evidence laid out in the record above, Stewart's claim that the ALJ substituted his own lay opinion for that of a medical expert lacks merit. Stewart argues that the record is devoid of a medical opinion assessing her functional abilities and that the ALJ did not consult a medical expert to make his assessment. However, the ALJ is not required to consult a medical expert for evaluation of mental RFC evidence, *Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir. 1989), and if no medical statement has been provided, then the court inquiry focuses on whether substantial evidence supports the ALJ's decision. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995) (internal citations omitted). Here, the ALJ considered the objective medical evidence, the opinions of the State agency physicians, and the consultative examiners to

come to the conclusion that the record showed no cognitive abnormalities aside from the limitations on working memory. (Tr. 27).

Stewart's claim that the ALJ failed to consider her mental impairments under Listing 12.04A is clearly without merit. The ALJ's report specifically noted Stewart's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04 and 12.06 (Tr. 25). Further, even if Stewart met the criteria under Listing 12.04A, she would still have to demonstrate that she satisfies the criteria under 12.04B by having marked restrictions in two of the following areas: activities of daily living, social functioning, and concentration, persistence, and pace. *See* Listing 12.04B. A claimant whose impairment fails to meet the stated criteria fails to qualify under Listing 12.04, and Stewart does not. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). As demonstrated above, substantial evidence supports the ALJ's finding that Stewart had only mild limitations in her activities of daily living and moderate limitations in social functioning and concentration, persistence, and pace. (Tr. 88, 112-13). Thus, substantial evidence supports the ALJ's decision that Stewart does not meet the Listing 12.04 criteria for Affective Disorders.

### B.    Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in

determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinex v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). However,, a claimant who fails to follow prescribed treatment without a good reason will be found not disabled. Social Security Ruling 82-59.

There are no expert medical opinions in the record that would support the conclusion that Stewart's workplace injuries met the 12-month durational requirement or are otherwise supported by the medical evidence in the record. There are also no expert medical opinions in the record that would support the conclusion that Stewart is unable to engage in any substantial gainful activity. Dr. Allen did not address or opine about Stewart's work-related activities, but Dr. Ekpo assessed Stewart's work-related activities following her injury. As set forth above, Dr. Ekpo conducted several examinations of Stewart in November and December of 2013, finally determining that Stewart's work-related difficulties were no longer restricted. (Tr. 335). Following the examination, Dr. Ekpo's opinion on Stewart's work-related difficulties was fairly conclusive because Stewart had fully recovered through physical therapy and medication. (Tr. 335-36).

Stewart's consultative exam took place on May 14, 2015. (Tr. 110). Following examination of Stewart, Dr. Reid opined in a the Disability Determination Explanation that

Stewart could lift and carry at most 50 pounds and frequently life or carry 25 pounds; that she could stand or walk for a total of 4 hours and sit for a total of about 6 hours in an 8-hour workday; and that she could only occasionally climb stairs and ramps, stoop, kneel, crouch, or crawl. (Tr. 110-11).

The ALJ's RFC determination is consistent with Dr. Reid's diagnosis and his functional capacity opinions in that it limited Stewart to jobs that only required occasional lifting and carrying between 25 to 50 pounds and only required Stewart to "occasionally climb stairs and ramps, stoop, kneel, crouch, or crawl." (Tr. 110-12).

### C.      Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by family and friends. Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

Stewart contends that the ALJ improperly determined her RFC by assigning little credible weight to her statements about the severity of her impairments. "The credibility determination is solely within the realm of the ALJ. A reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding." *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012). In performing this assessment, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence." *Woods v. Berryhill*, 888 F.3d 686 (4th Cir. 2018) (quoting SSR 96-8p, 61

Fed. Reg. at 34,478). The ALJ did so here by concluding Stewart could perform medium work and summarizing evidence he found credible and consistent.

Stewart testified at the hearing on July 27, 2016 that she could not work due to joint and back pain, arthritis, and migraines, which she described as follows:

Q:    Okay. And why did you leave the position with Whataburger?

A:    With the medications I was taking, I couldn't focus, I couldn't – I couldn't do what I was supposed to be doing as a manager. And I was in so much pain until like every five, ten minutes I would have to go and sit down and on top of that I was having migraine headaches and have to sit up in the office and just close the door with the lights off. And, you know, it just wasn't very good for me. So I tried them for like a couple of weeks, and after that I realized that not only that was going on, I just couldn't focus and get along with my coworkers and my – my supervisors. The pain was causing so many issues until I just couldn't – I just couldn't focus.

Q:    Okay.

* * *

Q:    --first. For the – the mental health conditions, and sometimes they've been – I'm not so worried about the name that's been put on it, versus depression or anxiety. I mean, I think different providers characterize things differently. I usually try and ask specific question. If you kind of picture yourself in the work setting, at a job from 8:00 or 9:00 in the morning to 5:00 at night. Can you tell me what kind of work impact you have from the mental health conditions?

A:    Reframe that.

Q:    Okay. I'm just trying to get a sense of, in your opinion, what's the work impact from the mental health conditions? How do they affect your ability to do a job? I'm somewhat less concerned about, you know, on a Saturday afternoon how it affects you. That's not really my job. It's more in a work setting, how do you think that would affect you?

A:    So you're asking me what would my job be like at that time of the day?

Q:    No. I'm just saying in terms of the mental health conditions; how do they affect your ability to work or not?

A:    Oh, Jesus. Your Honor, it – it – it works like – I'm at this – I'm not able to think about what I'm asked to do. I'm not understanding exactly what I'm supposed to be doing although I'm been in the business for however long. I cannot complete a

task. I start on something, but I never finish it. So my mind is on one thing while the work, you know, I'm at work thinking about something else. So they just never meet.

Q: Okay. And when you're saying you have the trouble completing tasks, what takes you off task?

A: The pain mostly, Your Honor. With my pain, it's like it's so severe until all I know basically is really restaurant. And we're standing up anywhere from 50 to 60 hours. But my pain is so severe, it doesn't allow me to even stand up a good ten minutes. So my past – I mean, it's – it's – I'd stand for about five or ten minutes, and then I'd sit down for like five or ten minutes. And, you know, it just don't work.

Q: Okay. Can you give me, in terms of the pain, like what areas of your body are affected?

A: Okay. Your Honor, I have fibromyalgia which affects my legs. I have neuropathy which is the burning sensation in my legs and arms. I have arthritis which affects my joints. I have degenerative disc in the top of my back and in the lower part of my back, which affects my right side all the way down. My shoulder and my neck and my back area.

Q: On the arthritis you said, is there a particular joint you have the arthritis in or –

A: Yes, sir. It's basically in my – knuckles and in my knees. My hands and my knees.

Q: Earlier you gave me a list of some medications and I just want to make sure, is that medications you're still taking through today? Is that –

A: Yes.

Q: -- the list?

A: Yes.

(Tr. 43-46).

Q: Okay. Now the – the migraines – were you having some migraines at work?

A: Yes, I was.

Q: Okay. And describe what would happen when you would have one of these – well let me ask you first, how often would you have a migraine?

A:      I'd have a migraine about twice a week.

Q:      Okay. And when you would have a migraine, what would happen, and how –
        how – how long would it affect you during the day? Would it knock you out for
        an hour, two hours, or half a day or all day or what?

A:      A migraine – what I would do when I'm having a migraine is to go into the office,
        close the door, turn the lights off. And basically sit up in there for about four or
        five hours. Then I would have to come back out eventually and go back in there.
        But all together, it would be about eight, nine hours.

Q:      All in one day?

A:      In one day.

(Tr. 52). She also testified that her absence at the restaurant caused anger issues with her

supervisor, coworkers, and customers. (Tr. 52-53). Stewart added that she also had pain in her

arms, back, legs, joints, hands, and shoulders, along with numbness in her extremities as a side

effect of her medication. (Tr. 54). The ALJ found that Stewart's testimony and her subjective

complaints about the severity of her pain and mental state not fully credible. In doing so, the

ALJ wrote:

> The severity of the claimant's mental impairments, considered singly and in combination,
> do not meet or medically equal the criteria of Listings 12.04 and 12.06. In making this
> finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the
> "paragraph B" criteria, the mental impairments must result in at least two of the
> following: marked restriction of activities of daily living, marked difficulties in
> maintaining social functioning, marked difficulties in maintaining concentration,
> persistence, or pace, or repeated episodes of decompensation, each of extended duration.
> A marked limitation means more than moderate but less than extreme. Repeated
> episodes of decompensation, each of extended duration, means three episodes within 1
> year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> In activities of daily living, the claimant has mild restriction. The claimant maintains an
> active driver's license, and her noted limitations are attributed to physical – rather than
> mental – impairments. The claimant noted needing assistance with activities of daily
> living, including shopping, due to physical impairments; nonetheless, she noted preparing
> simple meals and performing some household maintenance tasks, e.g., cleaning dishes,
> sweeping, and laundering clothing (Exhibit 3E; 7E).

In social functioning, the claimant has moderate difficulties. The claimant endorsed difficulties getting along with others secondary to her impairments (HT). Nonetheless, she indicated regularly socializing with others in person, by phone, and via computer (Exhibit 3E). Further, she was noted to be pleasant and cooperative without behavior abnormalities on examination, save one instance of tearfulness (Exhibit 2F; 6F).

With regard to concentration, persistence, or pace, the claimant has moderate difficulties. The claimant reported difficulties focusing and following instructions at work secondary to her impairments (HT). The claimant reported starting – but not finishing – tasks (HT). Nonetheless, on her functions, the claimant denied needing reminders to groom and take medication (Exhibit 3E). Further, she noted that she was able to manage money and her household finances (Exhibit 3E). During a November 2014 consultative examination, the claimant was alert and oriented with good remote memory, though her working memory was impaired at five minutes. Notably, she had no difficulties with simple auditory attention tasks (Exhibit 3F/4).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

* * *

Similarly, with respect to her mental impairments, the claimant noted a difficulty getting along with others and following instructions, which is not substantiated by the record. The record shows the claimant presented as consistently pleasant and cooperative, despite one instance of tearfulness with a depressed affect. Further, as detailed above, aside from limitations with working memory, the record shows no cognitive abnormalities. Thus, the record does not support the degree of impairment alleged. I note that the claimant's occasionally depressed/tearful affect and limitations on working memory support restrictions on social interaction and task complexity, as provided.

* * *

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence as detailed above.

(Tr. 25-27).

With respect to her physical impairments, the ALJ noted that the record shows mild to moderate degenerative changes with occasional treatment and abnormalities, including observations of an abnormal gait and tenderness (Tr. 27, 307, 437). The record also consistently

shows intact strength and sensorimotor function, with no difficulties ambulating independently, and a normal range of motion (Tr. 23, 27, 307, 309, 344, 413-414, 429, 433, 464). A medical condition that can be remedied by conservative treatment is not disabling. *See Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986). The objective medical record, including diagnostic imaging, are indicative of mild to moderate degenerative changes, consistent with a restriction to modified medium exertional work, and with the limitations set forth in the RFC (Tr. 27, 401, 410, 412, 414). While Stewart complains that her pain limits her ability to stand and perform other basic work activity (Tr. 26, 39, 43, 45), her subjective complaints of disability must be corroborated, at least in part, by objective evidence. *See Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). Substantial evidence supports the ALJ's determination that claimant's statements regarding the intensity and duration of her symptoms were not entirely credible; the ALJ noted evidence showing little to no functional loss. The ALJ concluded that Plaintiff's otherwise unremarkable presentation is not consistent with the degree of alleged limitation. (Tr. 27). The ALJ explained how he concluded – based on this evidence – that Stewart could actually perform the tasks required by medium work:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence as detailed above.

(Tr. 27). After reviewing the record, the Court finds that the ALJ correctly applied the relevant legal standards, and that substantial evidence supports his credibility determination.

Credibility determinations, such as that made by the ALJ in this case in connection with Stewart's subjective mental complaints, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to

determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'"). Here, the ALJ supported his credibility determination with references to the medical evidence and the testimony about Stewart's activities. In addition, the ALJ's credibility determination is supported by Stewart's contradictory statement that she could not stand for more than five to ten minutes, followed by her stating that she did not need help bathing while standing. (Tr. 43-46, 59). Accordingly, the subjective complaints factor, when viewed in the context of the ALJ's supported credibility determination, also supports the ALJ's decision.

### D.      Education, Work History, and Age

The fourth element considered is the claimant's educational background, work history, and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

Here, at the time of the administrative hearing before the ALJ, Stewart was 55 years old, she had a high school education, and had past relevant work as a fast food restaurant manager and pharmacy technician. (Tr. 70-71). Taking those factors into consideration, the ALJ questioned the vocational expert as follows about whether a person of Stewart's age, education, past work experience, and RFC could perform her past work, or any other jobs that exist in significant numbers in the regional and national economy:

Q:      Okay. I'd like you to assume a hypothetical individual of the claimant's age, education, and with the past work that you've described. Further assume the individual is limited as follows: limited to the medium exertional level. Limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching.

A:      All limited to occasional?

Q:      Occasional, yes.  For those and then the individual is precluded from climbing ladders, ropes, and scaffolds, and crawling.  The individual is limited to understanding, remembering, and carrying out detailed, but not complex tasks and instructions.  And is limited to occasional interaction with public coworkers and supervisors.  Did you –

A:      Occasional interaction with public and coworkers?

Q:      And supervisors.  Could that hypothetical individual perform any of the past work that you've described?

A:      No, Your Honor.  Not in my opinion.  All of the jobs are the complex level.  And would require more than occasional contact with public, coworkers, and supervisors.

Q:      Okay.  And could that hypothetical individual perform any other work available in the national economy, and if so, could you give me some examples?

A:      Okay.  Just a minute, Judge.

Q:      Certainly.

A:      No, Your Honor.  Not – not in my opinion.  I'm not able to identify any jobs.  What happens is at the medium unskilled level, is if – what the jobs that I was able to identify would require more than – than occasional balancing and crouching.  And I'm assuming stooping is also included; is that correct?

Q:      As occasional, yes.

A:      Yeah.  Yeah, they require more than – balancing, crouching, and stooping are at the frequent level.

Q:      Okay.  They – I'm not following you.  The limit wasn't to simple or unskilled work.  It was limited to understanding and carrying out detailed but not complex tasks and instructions, so –

A:      Right.

Q:      Would there be semi-skilled work that would be otherwise consistent with that hypothetical?

A:      Let me see.  I was able to – just a minute.  I was able to identify, let's see – was able to identify several jobs related to the restaurant business.  The job of pastry cook helper.  Wait a minute.  Let me double check.  No.  that's going to be more than occasional contact with coworkers, Judge.  Just a minute.

Q:     Okay.

A:     I was able to identify the job of deep fry cook. Now it's work at the medium level and the unskilled level.

Q:     Okay.

A:     As far as the extent of the job –

Q:     Could we get the DOT and SVP?

A:     Oh, sure, I'm sorry.

Q:     Sure. It's all right.

A:     The DOT code number is 526.685-014; the work is classified at medium level, an SVP 2. And actually there's no occasionally there's no balancing or crouching or stooping involved. As far as the number of jobs, the best estimate I can give you is about 6,000 such jobs in the state of Texas. And about 22,000 such jobs in the U.S. Let's see. The job of hand launderer. The DOT number is 361.684-010. It's medium work, it's unskilled work. There's no climbing, balancing, or crouching. As far as the outlook of the job, it looks like about 2,500 such jobs in the state of Texas. And about 14,000 such jobs in the U.S. the job of laundry worker. The DOT code number is 361.684-014; it's medium work, it's unskilled work. As far as the extent of that job in the state of Texas, it looks like about 3,000 such jobs. And in the U.S. economy, it looks like about 20,000 such jobs.

Q:     All right. Then for a second hypothetical. The second hypothetical will be the same as the first, except we'll change the exertional level from medium down to light. There has been a recent age change to age 55 but there was a period before she turned 55. So for this first run through at light, let's avoid – this will cover the period before 55 so no discussion of transferable skills. And then I'll ask it again as the next hypothetical whether or not there's transferable skills for the period after 55. Is that okay?

A:     Okay.

Q:     All right. So then for the second hypothetical, like I said, it's the same as the first, except the exertional level will be light instead of medium.

A:     Okay.

Q:     Is the – am I correct that that past work is still precluded?

A:     That would be correct.

Q:      Okay.  That could be that hypothetical individual perform any other work available in the national economy, and if so can you give me some examples?

A:      Yes, sir.  With looking at jobs in the person age 54, we'd be looking at jobs in the light, unskilled category.  Some examples of such jobs that would fit the hypothetical as given, would be ticket printer and tagger.  The DOT code number is 652.685-094; it's light work, it's unskilled work.  As far as the extent of that job in the state of Texas, --

Q:      Could we get the SVP of that, please?

A:      Sure.  SVP level is 2.

Q:      Okay.

A:      As far as the extent of that job in the state of Texas, approximately 3,000 such jobs.  In the U.S. economy about 22,000 such jobs.  The job of garment bagger.  The DOT code number for that job is 920.687-018.  It's light work, unskilled.  The SVP level is a SVP 1.  As far as the extent of that job in the state of Texas, approximately 2,800 such jobs.  In the U.S. economy about 13,000 such jobs.  The job of retail marker.  The DOT code number is 209.587-034.  It's light work, unskilled.  The SVP level is SVP 2.  As far as the extent of the job in the state of Texas, about 2,800 such jobs.  In the U.S. economy about 17,000 such jobs.

Q:      Okay.  So the third hypothetical will be the same as the second except we'll cover the period after age 55.  And so could that hypothetical individual perform any other work available in the national economy, and if you could limit your responses to jobs that could be performed only with transferable skills from the claimant's past work, if any.

A:      Yes, sir.  Your Honor, from the standpoint of past work, no I was not able to identify any jobs.  They're all going to involve – the jobs that I looked at from the standpoint of transferability of skills they're all going to require more than occasional contact with the public.

Q:      Okay.

A:      At the light level.

Q:      So, okay.  And then for a fourth hypothetical.  The fourth hypothetical will be the same as the third except we'll go from light down to sedentary.  And am I correct that the past work is still precluded?

A:      Yes, sir.

Q:     Okay. And could that hypothetical individual perform any other work available in the national economy. And if you could limit your responses to jobs that could be performed with transferrable skills from the past work, if any.

A:     Your Honor, I was only able to identify – well the jobs I was able to identify would require more than occasional contact with the general public, coworkers, and supervisors.

Q:     Okay.

A:     So, no, I was not able to identify any jobs.

Q:     Okay. I anticipated that based on the prior hypothetical, I just wanted to confirm there was nothing transferrable to sedentary. Okay. All right.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q:     Dr. Webber, under hypothetical one, with regard to those jobs of deep fry cook, hand launderer, laundry worker, and also under hypothetical two, the jobs that you identified as ticket printer and tagger, garment bagger, and also retail marker, if the worker was off task one and a half to two days a week with migraine headaches could any of these jobs be performed?

A:     No, off task meaning not there, sir?

Q:     Well, perhaps there on the job, but unable to function, unable to work.

A:     No, sir.

                              * * *

Q:     And Dr. Webber, also with regard to those same six jobs, if the worker was unable to come to work due to pain and other medical issues two days a week, that is off task 40% of the time, would any of those jobs be available.

A:     No, sir.

Q:     All right.

                              * * *

BY ADMINISTRATIVE LAW JUDGE

Q:     And just the record – for those two hypotheticals, the off task one and a half to two days a week or be absent two days a week, would that preclude all other competitive work beyond those jobs that you gave me for hypos one and two?

32

A:    Yes.

(Tr. 71-78).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Where the testimony of a vocational expert directly and obviously conflicts with information in the Dictionary of Occupational Titles ("DOT"), and where the issue of disability is determined at steps four or five, "the probative value and reliability of the [vocational] expert's testimony" is called into question. *Carey v. Apfel*, 230 F.3d 131, 147 (5th Cir. 2000). Where, however, the testimony of a vocational expert only indirectly or impliedly conflicts with information and job descriptions in the DOT, the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so. *Id.* at 146-147.

Stewart's third claim that the ALJ erred in finding a significant number of jobs in the national economy she could perform is also without merit. Here, the ALJ did not fully rely on the vocational expert's opinion (Tr. 28-29) because the results of the post-hearing examination by Dr. Webber that Stewart's limitation to unskilled medium occupational differed from the record evidence at the time more than expected, resulting in the hypotheticals that were asked of the vocational expert not matching the RFC found by the ALJ. Instead, the ALJ relied on the

Medical Vocational Guidelines in making his determination that Stewart was not disabled. In doing so, the ALJ wrote:

> In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).
>
> If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by the Medical-Vocational Rule 203.14. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as Deep Fry Cook (DOT 526.685-014, Medium, SVP 2-unskilled, approximately 22,000 jobs nationwide, 6,000 jobs in Texas); Hand Launderer (DOT 361.684-010, Medium, SVP 2-unskilled, 14,000 jobs nationwide and 2,500 jobs in Texas); and Laundry Worker (DOT 361.684-014, Medium, SVP 2-unskilled, 20,000 jobs nationwide and 3,000 jobs in Texas).
>
> Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 28-29).

Stewart argues that the ALJ erred in relying on the Medical Vocational Guidelines to find her not disabled because the ALJ's RFC provided for her ability to do unskilled medium work,

with a list of other limitations. But, contrary to Stewart's argument, the Medical-Vocational Guidelines can be used as a framework for determining disability as long as there is some evidence in the record that the additional limitations placed on a claimant's ability to perform work at a certain level do not significantly erode the jobs available at that level. *See McCuller v. Barnhart*, No. 02-30771, 72 F.App'x 155, 2003 WL 21954208 *5 (5th Cir. Aug. 15, 2003); SSR 96-9p, 1996 WL 362208 (1996).

Here, the ALJ, in explaining his reliance on the MVG, found that Stewart was able to perform many of the jobs noted by the vocational expert notwithstanding Stewart's additional limitations. The ALJ also found, by reference to the contents of SSR 85-15 and SSR 96-9P, that Stewart's occupational base would not be significantly eroded by the additional, non-exertional limitations contained in the RFC. Given the evidence contained in SSR 85-15 and SSR 96-9 as to the erosion of the claimant's occupations base, the ALJ did not err in relying on the Medical Vocational Guidelines to determine disability. *See e.g Breslin v. Commissioner*, No. 12-2385, 509 F.App'x 149, 154-155, 2013 WL 93159 (3d Cir. Jan. 9, 2013) (finding that the contents of SSR 96-9p provided substantial evidence in support of the ALJ's determination that a claimant's nonexertional limitations did not erode the claimant's occupational base); *McCuller*, 2003 WL 21954208 at *4-5 (upholding reliance on the Medical Vocational Guidelines where non-exertional limitations were found not to significantly erode the occupational base).

Additionally, Stewart argues that a finding that a claimant is able to engage in substantial gainful activity requires a determination that the claimant can hold whatever job he finds for a significant period of time. *See Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984)). Stewart's reliance on *Singletary* is misplaced, however, because the claimant in *Singletary* was never able to hold a job for long

periods due to his mental problems. *Singletary*, 798 F.2d at 822, 823. A determination that a claimant is unable to continue working for significant periods of time must, however, be supported by more than a claimant's personal history; it must also be supported by medical evidence. *Id.* at 822 (citing 20 C.F.R. §§ 404.1546; 404.1560). The court found that there was sufficient medical and personal history evidence to support Singletary's claim that he was unable to hold a job because several of his doctors attested that it would be "doubtful that [Singletary] may be able to return to employment" due to his mental issues. *Id.* In this case, Stewart's work report reflects that she has held several different positions for periods of several years. (Tr. 28, 235, 249-250). As the result, the holding in *Singletary* does not apply and the ALJ had no additional duty to determine whether Stewart could sustain work for a significant amount of time.

Moreover, as set forth above, it is the Commissioner's burden at step five to show that there are jobs in significant numbers in the national and regional economy that the claimant can perform. *Perez v. Barnhart*, 415 F.3d 457, 451 (5th Cir. 2005). Once this burden is met, it is the claimant's burden to rebut it. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). By taking administrative notice of the significant number of jobs available at the unskilled medium level in Texas and then explaining how Stewart's additional limitations would not significantly erode that occupational base, the ALJ met the Commissioner's burden at step five. Stewart, who did not rebut that determination at step five, or show that the occupational base was significantly eroded by her additional limitations, has not provided the Court in this appeal with a basis for remand.

## IV. Conclusion and Order

Based on the foregoing and the conclusion that the decision of the Commissioner is supported by substantial evidence and that the decision comports with applicable law, it is:

ORDERED that Defendant's Motion for Summary Judgment (Document No. 21) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 19) is DENIED, and the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 27th day of July, 2018.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE